# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN TODD THOMPSON,<br><br>Defendant. | Case No. 1:18-cr-00401-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

On the evening of December 8, 2018, a magistrate judge signed a warrant authorizing police to search Defendant Steven Thompson's home. They found a little under an ounce of meth, a scale, a shotgun shell, and a few gun magazines. Thompson moves to suppress this evidence. (Dkt. 150). He says the affidavit supporting the search warrant did not establish probable cause to conclude he was a drug dealer or that drugs would be found in his home. Alternatively, Thompson says he is entitled to a *Franks* hearing because the ATF agent who swore out the affidavit intentionally or recklessly misled the magistrate by omitting facts and by including other false and misleading facts. For the reasons explained below, the Court disagrees and will deny the motion.

# DISCUSSION

1. **Facial Validity of the Warrant**

The Warrant Clause of the Fourth Amendment generally requires police to obtain a warrant from a neutral magistrate before searching private property. *See* U.S. Const. amend. IV. The amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, . . . ." *Id.* Probable cause is established when there is "a fair probability that contraband or evidence is located in a particular place. Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question. Neither certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050-51 (9th Cir. 2007) (internal quotation marks and citations omitted). In other words, probable cause "is not a high bar: It requires only the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 571 U.S. 320, 337 (2014) (internal quotation marks and citation omitted).

In determining whether a search warrant was based upon probable cause, the district court is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985). Further, review of a magistrate judge's determination that probable cause existed is deferential; "the

duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 238-39 (1983). As the Ninth Circuit has explained, "[n]ormally, we do not 'flyspeck' the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference." *Kelley*, 482 F.3d at 1050. Also, "[i]n borderline cases, preference will be accorded to warrants and to the decision of the magistrate issuing it." *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir. 1987).

A. The Affidavit

ATF Agent Janeece Gonzales swore out the probable-cause affidavit, which focuses primarily on David Roberts and his girlfriend Echo Dalos. In April 2018, an informant[1] told law enforcement that Roberts "and others" were distributing large amounts of methamphetamine and heroin. *Gonzales Aff.* ¶¶ 11-12. The informant said she and her boyfriend had accompanied Roberts to Las Vegas and Los Angeles on drug runs. *Id.* ¶ 12. Investigators also looked at location data for Roberts' cell phone, which indicated Roberts had traveled to Nevada eleven times between April and December 2018, and that on five of those trips his cell phone

---

[1] In this opinion, the Court uses the generic term "informant" to refer to "cooperators" and "confidential informants" mentioned in the affidavit.

went on to southern California. *Id.* ¶ 24.

During the summer of 2018, police searched trash from Roberts' and Dalos' homes. They found methamphetamine and drug paraphernalia in Roberts' trash and marijuana in Dalos'. *See id.* ¶¶ 15-17. Later that summer, another informant told law enforcement he had obtained "significant quantities" of meth from Roberts within the last year or so and that Dalos sold meth for Roberts. *Id.* ¶ 13. Additionally, Agent Gonzales reported that investigators had made controlled buys from both Roberts and Dalos at their homes. *Id.* ¶¶ 18-23.

In late September 2018, law enforcement officers used cell phone location data to track down Roberts on a "return trip." *Id.* ¶ 25. They saw Roberts stop at a casino in Jackpot, Nevada. A person driving a Mitsubishi Galant stopped with Roberts. At the time, investigators believed the second person was Kyle Pherigo. Pherigo and Roberts went into the casino together and later left together, travelling in tandem northbound toward Twin Falls, Idaho. Investigators lost sight of the vehicles at some point but later saw the Galant parked at 280 Harrison Street, which is Thompson's home. *Id.*

Thompson points out that the warrant affidavit does not contain the sort of detailed information about him that it does about Roberts and Dalos. There is no mention of any informants implicating Thompson in drug-trafficking activities; there is no mention of a positive hit on a trash search at his residence; and there is

no mention of any controlled buys involving Thompson or his residence.

Rather, it appears that agents did not begin focusing on Thompson until mid-November 2018, when a wire went up and investigators began listening to Roberts' telephone calls and reading his texts.[2] The affidavit states:

- "Roberts frequently communicates with Steven Thompson who uses telephone number 208-297-9870. Investigators initially believed the user of this telephone was Kyle Pherigo who lives with Thompson at 280 Harrison Street but investigators later confirmed the user of the telephone as Thompson through visual surveillance while he was speaking to Roberts." *Id.* ¶ 31.

- "Since investigators began to intercept the communications, Thompson frequently communicates to Roberts that he has 'paper' for him." *Id.*

- "Thompson also frequently communicates with Roberts about law enforcement surveillance." *Id.* ¶ 32.

- "In this particular case, agents have intercepted numerous communications with Roberts, Dalos, Thompson, and others where they are using their cell phones to discuss drug transactions and drug proceeds." *Id.* ¶ 39.

In her affidavit, Agent Gonzales provides two specific examples regarding Thompson's texts to Roberts about "paper." On November 18, Thompson texted Roberts, "Got paper for u." ¶ 31. Ten days later, Thompson texted "When u get back come by and get This paper." *Id.* Agent Gonzales explains that based on her

---

[2] This Court authorized a wiretap on August 16, 2019. *Gonzales Aff.* ¶ 27.

**MEMORANDUM DECISION AND ORDER - 5**

experience, when Thompson says he has "paper," he means "he has collected money that he owes Roberts for drug transactions." *Id.*

Regarding Thompson's warnings to Roberts about police surveillance, Gonzales provides three examples. On November 18 (the same days as one of the "paper" texts) Thompson called Roberts and told him an unmarked vehicle had followed Thompson when he left Roberts' house. *Id.* ¶ 32. Three days later, Thompson texted this message to Roberts: "I see a grip of pigs on corner where u at." *Id.* And, in a series of messages on November 28 (the same day as another "paper" text), Thompson "communicated with Roberts about vehicles in the area and texted, 'Feds. For Sure.'" *Id.* Agent Gonzales explains that, based on her experience with drug investigations, "drug traffickers are commonly on the lookout for police surveillance and communicate with coconspirators about potential police surveillance to avoid detection." *Id.*

### B. Analysis

In moving to suppress, Thompson argues that although the warrant affidavit supplies plenty of probable cause regarding Roberts and Dalos, it fails to provide probable cause as to him.

The Court disagrees. Granted, there is more incriminating evidence about Roberts and Dalos, but there is still enough about Thompson. The affidavit reports that investigators began monitoring communications in mid-November and that

Thompson frequently communicated with Roberts – who was most assuredly selling drugs – including telling Roberts he had money for him and warning him about police surveillance. Thompson says there is an innocent explanation; he says his contacts with Roberts could be "incidental," representing "mundane, day-to-day activities." *See Motion Mem.* at 9, Dkt. 150-1; *Reply* at 10, Dkt. 170.

Maybe Thompson needed to give money to Roberts twice in the space of ten days for some other, perfectly innocent run-of-the-mill transaction. And maybe Thompson warned Roberts about Feds and grips of pigs at the same time he was telling Roberts he had "paper" for him for completely innocent reasons.

But that is just one way to view the facts, and it doesn't fully account for the surrounding circumstances described in the affidavit. To recap: (1) Roberts was a drug dealer; (2) Thompson frequently told Roberts to come get "paper" from him and warned Roberts about police surveillance; (3); Roberts would often travel to Nevada or California with others to resupply himself with drugs; and (4) a couple of months before the search, Roberts and another person (then believed to be Kyle Pherigo) were seen together in Jackpot, Nevada; they traveled back to Idaho in tandem, in separate cars, with one of those cars ultimately parking at Thompson's home.

When he was presented with all these facts, the magistrate judge could reasonably infer that Thompson was a drug dealer and that drugs would be found

at his home at 280 Harrison Street. The Ninth Circuit has affirmed that searches of suspected drug dealers' homes, even where there is no direct evidence linking the homes to illegal activity, is appropriate because the presence of evidence in a drug dealer's home is a reasonable inference to draw. *See, e.g., United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986); *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985). In *United States v. Pitts*, 6 F.3d 1366 (9th Cir. 1993), the court expressly "recognized that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" Additionally, "a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir. 1987).

For all these reasons, and in light of the deferential standard of review, the Court concludes that the warrant affidavit supported the magistrate judge's probable-cause finding.

2.  **Defendant's Request for a *Franks* Hearing**

The next question is whether Thompson is entitled to a *Franks* hearing.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge. The Fourth Amendment requires an evidentiary hearing on the veracity of a warrant affidavit, and

ultimately on the constitutionality of the search, when a defendant requests such a hearing and "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and ... the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56. *Franks* also applies to deliberately or recklessly deceptive omissions. *See, e.g., Shell v. United States*, 448 F.3d 951, 958 (7th Cir. 2006) (recognizing omission theory but finding no violation).

It is difficult to make the "substantial preliminary showing" required under *Franks*. Allegations of negligent or innocent mistakes do not suffice, nor do conclusory allegations of deliberately or recklessly false information. To obtain a hearing, the defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations or omissions, and the claim of falsity should be substantiated by the sworn statement of witnesses. *Franks*, 438 U.S. at 171. The defendant must also show that if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent. *See id.* at 171-72. That showing does not necessarily entitle the defendant to a favorable finding on the merits, but it entitles the defendant to a hearing where he must prove falsity or recklessness (as well as materiality) by a preponderance of the evidence. *Id.* at 156. At the hearing

stage, the court reconsiders the affidavit, this time eliminating any deliberate or reckless false statements and incorporating any omitted material facts, and determines whether probable cause existed nevertheless. *See, e.g., United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013).

1. **The Trash Pull**

Thompson says the warrant affidavit contains a deceptive omission because although Agent Gonzales told the magistrate judge about the trash pulls at Roberts' and Dalos' homes, she did not say anything about a trash pull at Thompson's house. In fact, officers had searched Thompson's trash on October 25, 2018 – after the June and July trash pulls at Roberts' and Dalos' homes, and much closer in time to the time Agent Gonzales signed the affidavit – and they did not find any drugs. Thompson says if Agent Gonzales had included this information, "it would have further attenuated an already weak connection to … [Thompson's] home as a place where drugs or other evidence of trafficking reasonably would be found." *Motion Mem.* at 16, Dkt. 150-1. More to the point, Thompson says if the magistrate had known about the dry trash pull, he likely would not have allowed officers to search Thompson's home.

The Court is not persuaded. Even if information about the October trash pull had been included, the affidavit remains sufficient to support a probable-cause finding because *after* the trash pull, Thompson communicated with Roberts about

"paper" and police surveillance. And *before* the trash pull, a car connected to Thompson's residence had traveled in tandem with Roberts on a trip back from Jackpot, Nevada. That Thompson's trash turned up dry on one day in October does not negate this evidence. *See generally Bravo v. City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011) ("If probable cause remains after amendment, then no constitutional error has occurred."). Thompson has thus failed to make the necessary showing to warrant a *Franks* hearing on this issue.

2.  **"Frequent" Communications**

Thompson has also failed to show that Agent Gonzales was deceptive in informing the magistrate judge that Thompson and Roberts "frequently" communicated. Here, Thompson focuses on paragraph 31 of the warrant affidavit, which begins with these two sentences:

> Roberts frequently communicates with Steven Thompson who uses the telephone number 208-297-9870. Investigators initially believed the user of this telephone number was Kyle Pherigo who lives with Thompson at 280 Harrison Street but investigators later confirmed the user of the telephone as Thompson through visual surveillance while he was speaking to Roberts.

*Gonzales Aff.* ¶ 31.

Thompson says these two sentences create a false impression – namely that "Thompson's already ambiguous telephone contacts with Roberts about 'paper' and 'counter-surveillance' may have extended throughout the investigation's time

frame, inflating his role and importance." *Motion Mem.* at 18-19, Dkt. 150-1. Thompson supports this argument by pointing to a police report listing several people who contacted Roberts by phone during June 15 to September 6, 2018 – before the wire was up. (Recall that the wire was authorized on November 16, 2018). Thompson is not listed in this report, and he says that by not including the report in her affidavit, Agent Gonzales intentionally or recklessly misled the magistrate.

The Court disagrees. First, the affidavit correctly reports that the wire was authorized in mid-November 2018. So the more logical reading of the later statement about Thompson and Roberts "frequently" communicating is that Agent Gonzales is reporting about communications between the two when the wire was up. Such a reading of the affidavit is borne out because within paragraph 31, Agent Gonzales details *November* 2018 texts and phone calls. She continues in that vein in paragraph 32.

Given that context, pointing to a report about phone records that pre-dates the wire is not particularly helpful, and it does not support an argument that Agent Gonzales misled the magistrate when she said Thompson "frequently" communicated with Roberts. Otherwise, the Court is not persuaded by Thompson's argument that Agent Gonzales' use of the word "frequent" created a misimpression regarding the time frame in which Thompson was contacting Roberts.

### 3. The Galant's "Later" Arrival at 280 Harrison

Finally, Thompson takes issue with the way Agent Gonzales describes the September 2018 trip from Jackpot to Twin Falls. In her affidavit, Agent Gonzales described how Roberts and the driver of a Mitsubishi Galant (then assumed to be Kyle Pherigo) met up at a casino in Jackpot, went inside the casino together, and then left together, travelling in tandem toward Twin Falls. The affidavit states that investigators lost sight of the two vehicles at some point but then goes on to say that they "*later* saw the rental vehicle [Roberts' car] parked at Dalos' residence. Pherigo's vehicle [the Galant] was parked less than a block away from Dalos's residence at 280 Harrison Street, Twin Falls, Idaho.'" *Aff.* ¶ 25 (emphasis added).

Thompson says that "[w]ith this phrasing, the affidavit implies that Pherigo returned from Jackpot with Roberts and then went straight to 280 Harrison, a place near where Roberts was also parked." *Id.* Thompson points out that, in fact, police officers located the Galant at a different address in Twin Falls (1611 Morningside Drive) and then, after that, saw the Galant at the Harrison Street address. Thompson argues that Gonzales misled the magistrate by not clarifying what "later" meant – that is, by not including the Galant's layover at 1611 Morningside Drive in the affidavit. He says if this information were included, it would have "weaken[ed] the implication that (1) Pherigo was acting as a lookout car (he and Roberts went their separate ways at some point in Twin Falls or before); (2) that

there may have been some connection, communication, or exchange between them in the Van Buren/Harrison neighborhood; or (3) that drugs or some other evidence could have made its way uninterrupted from this trip into the home on Harrison." *Id.* at 17.

The Court is not persuaded. First, there is no overt misrepresentation. The affidavit correctly reports that investigators lost sight of the vehicles and then "later" located Roberts's rental on Van Buren Street and the Galant a short distance away at the Harrison Street address. Second, the Court is not persuaded that leaving out the stop at Morningside Drive created the false impression that the Galant traveled straight to Harrison Drive – without any intermediate stops – from Jackpot. The Court is mindful that "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw . . . ." *Stanert*, 762 F.2d at 781. But here, even on a cold reading of the affidavit, a judge would not necessarily infer that the Galant traveled straight to Harrison Street after the affidavit indicated that the investigators lost sight of the vehicles at some point in time. It's not fair to presume the magistrate judge made such an inference. Further, even if the Morningside Drive stop had been included, probable cause would still exist. *See generally Bravo v. City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011) ("If probable cause remains after amendment, then no constitutional error has occurred."). Even accounting for the Morningside Drive stop, the underlying

facts remain: Roberts and Pherigo went into the casino together; they left together; and the Galant later ended up at Harrison Street.

## ORDER

**IT IS ORDERED that** Defendant's Motion to Suppress (Dkt. 150) is **DENIED.**

DATED: October 29, 2019

B. Lynn Winmill
U.S. District Court Judge